UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

GRUBHUB INC.,                                         :

                Plaintiff,           :   **21 Civ. 10602**

    -against-                                  :   **COMPLAINT**

CITY OF NEW YORK,                               :   **JURY TRIAL DEMANDED**

               Defendant.         :

-------------------------------------------------------------x

Plaintiff GRUBHUB INC., by and through its attorneys, Cahill Gordon & Reindel LLP,

alleges for its complaint against Defendant CITY OF NEW YORK, as follows:

## NATURE OF THE ACTION

1.      Two recently-enacted New York City laws — NYC Int. 2311-A ("Int. 2311-A")[1]

and NYC Int. 1897-A[2] ("Int. 1897-A"; collectively with Int. 2311-A, the "Ordinances") — create

an unconstitutional, privacy-infringing, data-disclosure requirement pursuant to which third-party

food-ordering and delivery platforms such as Grubhub Inc. ("Grubhub") must divulge, against

their will, sensitive, proprietary customer information — which Grubhub spends tens of millions

of dollars on sales and marketing to acquire — to their New York City restaurant partners.  *See*

N.Y.C. Admin. Code §§ 20-563.7, 20-847.3.  More specifically, the Ordinances force Grubhub to

divulge their customers' full names, telephone numbers, email addresses, delivery addresses, and

order contents to New York City restaurants from which the customer places a Grubhub order,

regardless of whether that restaurant maintains ***any*** security infrastructure, and regardless of

---

[1] Adding § 20-847.3 to Subchapter 22 of Chapter 5 of Title 20 of the New York City Administrative Code.

[2] Adding a new Subchapter 36 (§ 20-563 through § 20-563.13) to Chapter 2 of Title 20 of the New York City Administrative Code.

whether the customer has expressly consented to their personal information being so shared. Even worse, restaurants may then use that private information to contact the customer directly for various purposes. The Ordinances state that customers are ***presumed*** to have consented to this dangerous flow of their information unless they specifically opt out for ***each and every order they place***, contrary to the common view that opt-out requests should be valid for at least several months. (The California Consumer Privacy Protection Act, for instance, mandates a 12-month moratorium between such requests.) This all occurs while Grubhub already offers restaurant partners a privacy-cognizant branded product for online ordering, Grubhub Direct, whereby restaurants can have direct access to customer data in a secured manner and receive certain of Grubhub's services free of commission.

2.     Defendant City of New York's (the "City") stated justification for the data-disclosure requirement — helping restaurants compete by combatting the effects of COVID-19 — is a pretext. As one City Council member put it, the City is merely "***hiding under COVID***" so it may "***weaponiz[e]*** . . . ***the pandemic for purposes of attacking an industry***" it "***do[es]n't like***." Ex. 1 (July 29, 2021 City Council Hearing Transcript) at 45:12-19 (statement of Council Member Kalman Yeger) (emphasis added). The data-disclosure requirement places the privacy of New York City individuals in imminent jeopardy by entrusting important sensitive, personal information to restaurants that are generally woefully unequipped to keep such information secure from hackers and other threats.

3.     In doing so, the Ordinances (i) compel Grubhub in violation of its free speech rights under the First Amendment of the U.S. Constitution and Article I, Section 8, of the New York Constitution to speak a message against its will and against its own business interests; (ii) substantially impair Grubhub's existing contracts with restaurants and customers, neither of

2

which contemplate this type of forced disclosure; (iii) mandate an unconstitutional taking of Grubhub's valuable trade secrets and confidential information without compensation; (iv) are an unlawful exercise of the City's police power; (v) infringe on Grubhub's constitutional rights under the Dormant Commerce, Due Process, and Equal Protection Clauses; and (vi) are preempted by New York State's Right of Privacy (N.Y. Civ. Rights Law §§ 50-51).

4.      Various privacy-advocacy groups have rallied against this dangerous data-disclosure requirement, given the adverse impact it will have on the privacy of customers who order food online from restaurants in New York City.  For instance, the Electronic Frontier Foundation ("EFF") published a memorandum explaining that the data-disclosure requirement creates a "***ripe target for hackers and data thieves*** who want to exploit" customers' data because restaurants, unlike the third-party platforms targeted by the Ordinances, do not "have the means or the knowledge to properly protect the information they receive from delivery platforms . . . exposing consumers to risk."  Hayley Tsukayama, *Memo in Opposition to Int. 2311-2021*, Electronic Frontier Foundation (July 27, 2021), https://cdn.vox-cdn.com/uploads/chorus_asset/file/22852929/EFFNYC2311_2021.pdf (emphasis added).  In opposing the Ordinances, the EFF emphasized that, because the Ordinances force customers to opt-out, rather than opt-in, the customer data will be shared with restaurants "***likely without their [i.e., customers'] knowledge***."  *Id.* (emphasis added).  The EFF also stated that "privacy should be the default of any transaction, and consumers should be asked to opt-in to sharing of their information every time it could be transferred to a new entity."  *Id.*

5.      The Data Catalyst Institute ("DCI") also opposed the Ordinances, stressing that they would hurt consumers and undermine their legitimate privacy interests.  The DCI described the data-disclosure requirement as "contrary to every government, law enforcement and consumer

advocate's stated goals regarding personal privacy, data protection and safety," and said that it turns "restaurants into favorable targets as hackers planning their next phishing scheme are always looking for up-to-date consumer data safeguarded by untrained employees." *Analysis of the New York City Council Proposed Bill (Int. 2311) – "Data on orders placed through third-party food delivery services"*, Data Catalyst Institute (July 2021), https://datacatalyst.org/wp-content/uploads/2021/08/Analysis-of-Int.-2311-Data-Catalyst-Institute.pdf.   Restaurants are so unequipped to securely handle the data of individuals in New York City that "consumer lawsuits . . . are inevitable against both the restaurants and the delivery apps." *Id.*

6.      The New York City Hispanic Chamber of Commerce raised similar concerns about the Ordinances, stating, "we are deeply distressed about this bill's potential impact on more vulnerable populations, especially undocumented customers . . . . [T]he lack of data security and the amount of data being shared will put this community in danger.  ***Please do not take this risk***." Cindy Rubi Estrada, *New York City Hispanic Chamber Of Commerce Letter To Protect Consumers And Businesses*, New York City Hispanic Chamber of Commerce (July 27, 2021), https://www.harlemworldmagazine.com/new-york-city-hispanic-chamber-of-commerce-letter-to-protect-consumers-and-businesses/ (emphasis added).  The Haitian American Caucus likewise opposed this "dangerous legislation" because it will cause "information [that] says a lot about you . . . held by a technology company that has specific products and policies designed to keep your personal information safe . . . [to be] up for grabs."  Sam Pierre, *Op-Ed: Council's data bill will harm vulnerable New Yorkers*, AMNY, https://bit.ly/3A7XXji.

7.      The City, however, brushed aside these grave constitutional and privacy concerns under the guise of protecting small business during the COVID-19 pandemic.  In reality, the ordinances are nothing more than another step in the City's unrelenting agenda against, and naked

animus toward, third-party platforms.  Moreover, even if the stated goal were legitimate (which it is not), the City failed to consider other means of accomplishing it without infringing on the constitutional rights of Grubhub and other third-party platforms.

8.      Even worse, this "attack" on a disfavored industry is being effectuated through unconstitutional means.  The Ordinances:

a.   compel Grubhub, in violation of its First Amendment rights, to speak a particular message that is against its business interests, by forcing Grubhub to provide valuable, sensitive business information to restaurants;

b.   substantially impair Grubhub's existing contracts both with New York City restaurants and customers;

c.   violate Grubhub's Fifth Amendment rights by forcing Grubhub to divulge its trade secrets and confidential information without just compensation;

d.   are an unlawful use of the City's police power that upsets the vertical separation of powers in New York in violation of the New York Constitution and other state laws; and

e.   violate Grubhub's rights under the Dormant Commerce, Due Process, and Equal Protection Clauses of the U.S. Constitution.

9.      Through this Complaint, Grubhub seeks declaratory relief, preliminary and permanent injunctive relief, and damages on the grounds that the Ordinances violate:

a.   The First Amendment to the United States Constitution and Article I, Section 8, of the New York Constitution;

b.   The Contract Clause of the United States Constitution;

c. The Takings Clause of the Fifth Amendment to the United States Constitution and Article I, Section 7, of the New York Constitution;

d. Article IX, Section 2(c), of the New York Constitution and related statutes (Police Power);

e. The Dormant Commerce Clause of the United States Constitution;

f. The Fourteenth Amendment to the United States Constitution and Article I, Section 6, of the New York Constitution (Due Process); and

g. The Fourteenth Amendment to the United States Constitution and Article I, Section 11, of the New York Constitution (Equal Protection).

10. Grubhub also seeks declaratory relief and preliminary and permanent injunctive relief on the grounds that that §§ 20-847.3(b), (c) and 20-563.7(b), (c) of the Ordinances, respectively, are preempted by N.Y. Civ. Rights Law §§ 50-51.

11. In pursuing this action, Grubhub seeks to vindicate the deprivation of federal constitutional rights under color of state statute, ordinance, regulation, custom, and/or usage. Grubhub therefore seeks damages and other relief under 42 U.S.C. § 1983. Grubhub is also entitled to attorneys' fees, expert fees, and costs if it prevails on any of its § 1983 claims. *See* 42 U.S.C. § 1988.

## PARTIES

12. Plaintiff Grubhub Inc. is a Delaware corporation founded in 2004 and headquartered in Chicago, Illinois. Grubhub's mission is putting technology in the hands of local restaurants to make it easier for them to connect with local diners. Grubhub partners with

approximately 28,221 restaurants in New York City,[3] bolstering the restaurants' efficiency by empowering them with access to e-commerce, while simplifying the lives of diner customers by easing the every-day burden of procuring meals.  Restaurants and other businesses using Grubhub benefit from its effective marketing efforts and enjoy increased orders and revenues.

13.     Defendant City of New York is a municipal corporation organized and existing under and by virtue of the laws of the State of New York.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over Grubhub's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a) and 42 U.S.C. § 1983 because Grubhub alleges violations of its rights under the Constitution and laws of the United States.

15.     The Court has jurisdiction over Grubhub's remaining claims pursuant to 28 U.S.C. §§ 1332, 1367 because there is complete diversity between the parties and the amount in controversy exceeds $75,000, and because the state law claims are so related to the federal claims asserted in this action that they form part of the same case or controversy under Article III of the United States Constitution.

16.     The Court has authority to grant declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, and under the Court's inherent equitable jurisdiction.

17.     Grubhub brings this action as both a facial and an as-applied challenge to the Ordinances and is excused from exhausting any administrative remedies before the City.  Grubhub

---

[3] *New York City*, Grubhub, https://www.grubhub.com/delivery/ny-nyc (last visited Dec. 10, 2021).

alleges that the Ordinances are invalid (i) on their face; (ii) as applied to Grubhub; and (iii) as applied to Grubhub's contracts with New York City restaurants and customers.

18.     Venue is proper in this Court under 28 U.S.C. § 1391, because the Defendant is located and resides in this judicial district and in the State of New York, the Ordinances were enacted in this judicial district by the New York City Council, and the violations of Grubhub's rights are occurring and will occur within this judicial district.

## FACTUAL ALLEGATIONS

**A.     Grubhub Provides Numerous Benefits Both to New York City Restaurants and Diner Customers**

19.     Grubhub's third-party platform connects approximately 33 million diners with over 300,000 restaurants across over 4,000 cities, including approximately 28,221 restaurants in New York City.[4]  Grubhub users can purchase food and other items from local businesses, for both pickup and delivery, through an easy-to-use interface.  Grubhub's platform offers a variety of benefits to both restaurants and diners.

20.     Specifically, Grubhub provides a suite of tools and services to restaurants aimed at growing their digital presence and increasing their business, including, among many others, "Grubhub for Restaurants" and "Grubhub Direct." With these products, restaurants are able to obtain additional online exposure, manage and fulfill pickup and delivery orders, receive payment for orders, view order and transaction histories, obtain financial statements and other information, and access customized ordering websites along with loyalty and customer data.  Grubhub's services encompass:  on-demand  order  management  and  dispatching;  procurement  and

---

[4] *About Us*, Grubhub, https://about.grubhub.com/about-us/what-is-grubhub/default.aspx (last visited Dec. 10, 2021); *New York City*, Grubhub (last visited Dec. 10, 2021).

development of restaurant-dedicated products to manage promotions, order volume, and menus; providing marketing for restaurants on its platform; onboarding delivery couriers, including background checks; compensating delivery couriers for their work; managing safety of delivery couriers; and providing dedicated customer service support for restaurants, couriers, consumers, and other businesses.

21.     Restaurants and other businesses using Grubhub benefit from its effective marketing efforts and enjoy increased orders and revenues.  Restaurants using Grubhub are able to receive and handle a larger volume of takeout orders with increased accuracy.  A 2015 study demonstrated that (i) one year after joining Grubhub, restaurants grow monthly takeout revenue by an average of 30%, which is six times greater than restaurants not using Grubhub; (ii) one in five restaurants double their takeout revenue one year after beginning to work with Grubhub; (iii) small restaurants typically see their revenue increase by 50% after partnering with Grubhub; and (iv) Grubhub cuts order processing times by over 50%, helping restaurateurs spend more time making food and less time managing orders. *The GrubHub Effect: Restaurants Using GrubHub's Platform See Six Times Greater Monthly Revenue Growth than Restaurants Not on the Platform*, Spectrum Equity (Oct. 2015), https://www.spectrumequity.com/news/the-grubhub-effect-restaurants-using-grubhubs-platform-see-six-times-greater-monthly-revenue-growth-than-restaurants-not-on-the-platform.  Diners also tend to order more food when placing an online order compared to orders placed over the phone. *See* Bharti Batra, *Why Integrating POS Software With Online Ordering Website Is A Good Idea*, Resto Labs (last visited Dec. 10, 2021), https://www.restolabs.com/blog/why-integrating-pos-software-online-ordering-website-good-idea.

22.     As explained by the City Council's July 29, 2021 Committee on Consumer Affairs and Business Licensing (the "Committee") Report, "[c]learly there are mutual benefits for both restaurants and [third-party platforms] in utilizing online ordering and delivery." Ex. 2 (July 29, 2021 Committee Report) at 5. Notably, restaurants that use Grubhub maintain the ability to engage in traditional forms of marketing and are free to contact potential customers to the extent they obtain such contact information outside of Grubhub's platform.

23.     Diners, meanwhile, benefit from a user-friendly interface permitting food delivery and takeout through a transparent and secure platform. Diners receive the benefit of Grubhub's customer service, as well as real-time updates regarding the status of their orders and the location of their delivery person. They also benefit from the ability to discover new restaurants on the Grubhub platform, access to menus, special offers and discounts, reviews of restaurants from other customers, and the use of a single app or website to order from numerous merchants, rather than having to fill out payment and delivery details anew for every order or place orders on the phone. Unlike traditional orders placed over the phone, there is a record of the transaction that is easily accessible to the customer, which facilitates easy back-end processes concerning incorrect items or charges, among other potential issues.

**B.     Grubhub Was a Lifeline to New York City Restaurants During the COVID-19 Pandemic**

24.     When the COVID-19 pandemic forced New York City restaurants and other businesses to shut down their in-person services and operations, orders placed through third-party food delivery services such as Grubhub were a salvation to those businesses. During the pandemic, delivery became "a lifeline for the hurting restaurant industry." Kabir Ahuja, Vishwa Chandra, Victoria Lord, and Curtis Peens, *Ordering in: The rapid evolution of food delivery*, McKinsey & Co. (Sept. 22, 2021), https://www.mckinsey.com/industries/technology-media-and-

telecommunications/our-insights/ordering-in-the-rapid-evolution-of-food-delivery; *see also* Ex. 2 at 4 ("With strict limitations on dining throughout the pandemic, [third-party platforms like Grubhub] were a crucial lifeline to New York City's restaurants[.]").

25.     Recognizing the tremendous pressure placed on the restaurant industry during the pandemic, Grubhub launched several initiatives to support restaurants.

26.     First, to incentivize diners to order from restaurants they had not yet ordered from, Grubhub instituted a Supper for Support promotion, which offered New York City diners $10 off their first order of $30 or more between 5 p.m. and 9 p.m.  Grubhub then provided $250 of funding for each New York City restaurant that would cover the initial cost of the promotion.  Between March and May 2020, the Supper for Support program provided more than $15 million in subsidies to restaurants nationwide.  Grubhub injected approximately $1.5 million in capital to New York City restaurants through this program.

27.     Second, Grubhub launched a Commission Deferral Program, through which it initially planned to suspend for two weeks up to $100 million in commission payments from impacted independent restaurants nationwide.  But when the pandemic extended longer than anticipated, Grubhub transformed its promise of commission deferrals into complete commission forgiveness, waiving 100% of all suspended restaurant commissions beginning in March 2020. Approximately 2,650 New York City restaurants participated in the program, resulting in $2.4 million in waived commissions in New York City.

28.     Third, to accelerate restaurant recovery in the wake of the pandemic, Grubhub launched a commission-free version of its services called Grubhub Direct.  Through Grubhub Direct, restaurants receive data directly from customers, which they can use for direct marketing. While restaurants utilizing Grubhub Direct benefit from the Grubhub platform's security, website

design, and efficiency, the data gathered is never Grubhub's — it is always owned by the restaurant.  Unlike the privacy dangers posed by the Ordinances, with Grubhub Direct, customers know exactly with whom they are sharing their data.

29.     Fourth, Grubhub's Community Relief Fund enables Grubhub donations and proceeds from its "Donate the Change" program — which gives customers the option to round up their order to the nearest dollar and donate the difference — to be routed to charitable organizations supporting restaurants and individuals adversely affected by the pandemic.  The Grubhub Community Relief Fund has provided more than $3.1 million to organizations serving New York City, including Rescuing Leftover Cuisine, MEANS, and Tacombi Community Kitchen, among others.

30.     Fifth, Grubhub facilitated a $2 million Restaurant Winterization Grant to provide restaurants $10,000 to assist them in extending outdoor dining through the Winter.  Pomodoro Ristorante Italiano, an Italian restaurant on the Upper West Side, said of the grant: "I built a beautiful outdoor space that hopefully I have for past 2021.  It has allowed me to have a bigger more visible presence.  The Winterization Grant is one of the true helpful avenues that I have encountered.  It seems that local government has no idea how small business runs.  I wish they could walk a day in my shoes, let alone a 35-year career." *Restaurant Strong Fund and Grubhub Award $10,000 Grants to Restaurants Across the Country*, Restaurant Strong Fund (last visited Dec. 10, 2021), https://www.restaurantstrong.org/restaurant-strong-winterization-grant-recipients-selected/.

31.     Sixth, Grubhub, in partnership with The Greg Hill Foundation's Restaurant Strong Fund, has provided grants to nearly 300 restaurants in New York City, totaling more than $2 million in support as they recover from the pandemic.

32.    In recognition of the vital support Grubhub provided New York City restaurants and residents during the COVID-19 pandemic, New York City Mayor Bill de Blasio proclaimed: "Banding together during hard times, putting people over profit, and supporting our local businesses is a model we should all follow, and I thank Grubhub for leading the way."  Press Release, *Grubhub and Major Cities Across the U.S. Launch Economic Relief Effort up to $100 Million for Independent Restaurants and Delivery Partners Impacted by COVID-19*, Grubhub (Mar.    13,    2020),    https://investors.grubhub.com/investors/press-releases/press-release-details/2020/Grubhub-and-Major-Cities-Across-the-US-Launch-Economic-Relief-Effort-up-to-100-Million-for-Independent-Restaurants-and-Delivery-Partners-Impacted-by-COVID-19/default.aspx.

33.    Grubhub has implemented these programs in recognition of the hardship placed on restaurants by the COVID-19 pandemic.

## C.    Grubhub Discloses Customer Data to Restaurants Only as Necessary to Fulfill Orders

34.    By signing up and placing an order through Grubhub, customers agree to Grubhub's standard Terms of Use, *see* Ex. 3 (Grubhub Terms of Use), which incorporate Grubhub's Privacy Policy.  *See* Ex. 4 (Grubhub Privacy Policy).  Chief among the contractual promises Grubhub makes to its customers is that their personal information will be shared with restaurants **only** "as needed to fulfill [their] orders."  Ex. 4 at 3.1;[5] *see also Analysis of the New York City Council Proposed Bill (Int. 2311) – "Data on orders placed through third-party food delivery services"*, Data Catalyst Institute (July 2021) ("There is an expectation among consumers that first-party data

---

[5] The Privacy Policy also acknowledges that certain information may be shared with "select restaurants and their brands" pursuant to those restaurants' privacy policies.  *See* Ex. 4 at 3.6.  But that sharing is done sparingly by Grubhub and only with restaurants that have established privacy policies and the necessary security to safely maintain such sensitive information.

collection, e.g., by the app, is legitimate and expected, but that data sharing requires explicit approval and consideration.").

35.     By forcing Grubhub to disclose against its will a customer's full name, phone number, e-mail and delivery addresses, and order contents, the Ordinances require Grubhub to divulge private customer information to restaurants beyond the scope of what is contemplated in Grubhub's Terms of Use and Privacy Policy.

36.     With respect to Grubhub restaurant partners using Grubhub's delivery services, Grubhub provides those restaurants with only the customer's first name, last initial, phone number, and order contents.  As for Grubhub restaurant partners using their own delivery services, Grubhub provides those restaurants with only the customer's first name, last initial, address, phone number, and order contents.   In both circumstances the restaurant's ability to view that customer information is time-limited — from when the order is placed through 24 hours after the order has been fulfilled.  This is in stark contrast to what is required under the Ordinances, which compel Grubhub to divulge customer information that will then be permanently in the possession of the restaurants.

37.     As detailed above, Grubhub also promises its customers that their information will be conveyed to restaurants *only as necessary to fulfill the order*.  The only reason Grubhub provides a customer's phone number to a restaurant is so the restaurant can contact the customer if there is an issue with that particular order.  Likewise, Grubhub provides customer addresses to self-delivery restaurants so the restaurant knows where to deliver the food.  And regardless, during the limited time that a restaurant can view this data, the data exists within Grubhub's secure ecosystem, where it cannot be downloaded or used by the restaurant other than to fulfill the order.

38.     Grubhub's contracts with restaurants also contain explicit promises that restaurants will not use customer information to send unsolicited communications.  Restaurants, franchisors, and merchants are prohibited from using customer information supplied by Grubhub to "market to or solicit any consumer."  Ex. 5 (Grubhub SMB Agreement) at No. 5; Ex. 6 (Grubhub Enterprise Agreement (Corporate Owned)) at 2(c); Ex. 7 (Grubhub Enterprise Agreement (Franchise)) at 5(d); *see also* Ex. 8 (Grubhub Enterprise Agreement (Restaurants)) at 2(g)(vi) ("Restaurant agrees . . . not to contact, advertise to, solicit, or sell to any customer.").  The Ordinances, unlike the contracts, would permit restaurants to use customer data for "marketing or other purposes." N.Y.C. Admin. Code §§ 20-847.3(c), 20-563.7(c).  By doing so, the Ordinances would interfere with these key contractual provisions between Grubhub and its restaurant partners, which ban "unsolicited calls and text messages, email spam, and junk mail."  Ex. 9 (June 8, 2021 Committee Hearing) at 21, 45.

39.     Grubhub's strict privacy conditions and safeguards exist not only to protect the privacy of its customers, but also to protect Grubhub's trade secrets — the valuable proprietary information Grubhub has spent substantial resources procuring and developing.

40.     First, Grubhub implements a variety of extensive security measures to ensure the confidentiality of customer data.  For example, the data is protected through Payment Security Standards Council-compliant authentication and encryption.  Furthermore, Grubhub's corporate Information Technology ("IT") department ensures that — across all Grubhub-managed devices, both internal and throughout Grubhub's extended network — active endpoint detection and response software (which ensures that all programs communicating with each other on the network are accounted for) protects against malware and other unauthorized programs.  Grubhub uses third-

party tools such as Portworx and Forter to help protect customer data from unauthorized access, and a managed security service provider to conduct security monitoring.

41.     Second, the customer data is not generally known outside of Grubhub's business. Although Grubhub shares certain information with restaurants as necessary to fulfill orders, that information rarely leaves Grubhub's secure system (unless Grubhub is integrating with a restaurant's separate point of sale system or other software used to manage orders, which have separate security standards), and is accessible by restaurants only for a limited period.   To the extent that Grubhub shares certain data with other parties (primarily service and analytics providers), Grubhub implements strict security measures surrounding that provision of data.   For example, Grubhub has a robust vendor onboarding process that investigates a vendor's security practices to confirm it is sufficient for Grubhub's standards.   All vendors with access to customer data must also sign Grubhub's data protection addendum, which requires that data will be used only to provide services to Grubhub and that strict security requirements will be maintained.

42.     Third, the customer data is also generally not shared internally with Grubhub employees.   Grubhub's IT department acts as a response team to identify and remediate any suspicious activity on any program across the Grubhub network and throughout Grubhub's cloud-based services.   The only Grubhub employees with access to customer data are employees who need access to such data, such as engineers or data analysts, all of whom are bound by confidentiality agreements governing data access.   Grubhub's security team also conducts reviews on who has access to certain data and removes access privileges if there is no longer a purpose for those access rights to be granted.   There is also an incident response plan that escalates data privacy issues in real time so Grubhub can investigate, mitigate damages, and remediate any such issues.

Furthermore, all Grubhub employees undergo annual security and privacy training that emphasize their obligations to keep customer data secure and confidential.

43.     Fourth, customer information is incredibly valuable to Grubhub and its competitors. For instance, customer data "enables [third-party platforms] to enhance their own services and produce more efficient, profitable systems." Ex. 10 (June 8, 2021 Committee Report) at 12.  It is a "very useful mechanism to drive future profits for restaurant owners, including growing the loyalty of a restaurant's existing customer base and reaching new audiences," Ex. 2 at 9, and can facilitate the ability to create targeted advertisements and alternative restaurant concepts such as "ghost kitchens." Ex. 2 at 8-9.

44.      Fifth, Grubhub expends significant resources in obtaining and developing the customer data.  Specifically, Grubhub spent tens of millions of dollars on sales and marketing in 2020, which, in turn, generated $8.7 billion in sales for local restaurants from more than 620,000 orders per day.

45.     Finally, it would be practically impossible for restaurants and other third parties to acquire or duplicate this information without a similar outlay of resources.

**D.     Enactment of the Ordinances**

46.     On July 29, 2021, the City Council approved Int. 2311-A and sent it to Mayor de Blasio for enactment.  Int. 2311-A regulates the relationship between "third-party food delivery services" and "food service establishments," the definitions of which derive from N.Y.C. Admin. Code § 20-845.

47.     Under the N.Y.C. Administrative Code, "third-party food delivery services" are defined as "any website, mobile application or other internet service that offers or arranges for the sale of food and beverages prepared by, and the same-day delivery or same-day pickup of food

and beverages from, no fewer than 20 food service establishments located in the city that are owned and operated by different persons." N.Y.C. Admin. Code § 20-845. "Food service establishments" are defined as "a place where food is provided for individual portion service directly to the consumer whether such food is provided free of charge or sold, and whether consumption occurs on or off the premises or is provided from a pushcart, stand or vehicle." N.Y.C. Admin. Code § 20-845 (citing N.Y.C. Health Code § 81.03(s)).

48.     Int. 2311-A requires a third-party food-delivery service, upon the request of a food service establishment, to provide their "customer data" to the food service establishment — the customer's full name, phone number, e-mail address, delivery address, and order contents. *See* Ex. 11 (Int. 2311-A); N.Y.C. Admin. Code § 20-563 (defining customer data). Third-party food delivery services must do this *unless* the customer requests, in relation to that specific order by the service, that the customer's information not be shared. N.Y.C. Admin. Code § 20-847.3(b). In other words, the customer is "presumed to have consented" to sharing their personal information. *Id.* Food service establishments may then use "such data for marketing or other purposes," not to be limited in any way by third-party food delivery services if done outside of that delivery service's platform. N.Y.C. Admin. Code § 20-847.3(c). Notably, these data sharing requirements do not apply to other businesses with which restaurants transact, such as advertising companies, online reservation platforms, or point-of-sale service providers (companies that make software used to effectuate sales).

49.     On August 19, 2021, while Int. 2311-A was on Mayor de Blasio's desk but before it was enacted on August 29, 2021, the Council introduced a new bill, Int. 1897-A, which implants Int. 2311-A's data-disclosure requirement into a separate Chapter of the New York City Administrative Code by adding a new subchapter (Subchapter 36). The August 19, 2021 version,

which is identical to the version of 1897-A ultimately enacted on September 26, 2021,[6] mandates that compliance with the data-disclosure requirement may be considered in denying, renewing, suspending, or revoking a third-party food-delivery service's license to operate in New York City. *See* N.Y.C. Admin. Code § 20-563.9.  It also provides a private cause of action against third-party platforms to "[a]ny person alleging a violation of any provision" of Subchapter 36, including the unconstitutional data-disclosure requirement.  N.Y.C. Admin. Code § 20-563.12.

50.     Int. 1897-A also made an important change to the definition of "third-party food delivery service," removing the requirement that services be provided to at least 20 food service establishments; now those services need be provided to only one food service establishment to meet the definition.  *See* N.Y.C. Admin. Code § 20-563.  Int. 1897-A also slightly changed the definition of "food service establishment" by revising the definition's inclusion of any "place" to only "business establishment[s] located in the city."  N.Y.C. Admin. Code § 20-563.

51.     Int. 1897-A, by its own terms, "repeal[s]" Subchapter 22 of Chapter 5 of Title 20 of the N.Y.C. Admin. Code, which contains Int. 2311-A.  Ex. 13.

52.     In addition to the Ordinances' confusing legislative scheme, statements from Council Members, community groups, and other interested parties demonstrate the improper purposes and inevitable dangerous consequences of the Ordinances.

**i.     Improper Purposes**

53.     The Committee's June 8, 2021 Report, issued through the Governmental Affairs Division, demonstrates the true purpose of the Ordinances — to economically advantage restaurants at the direct expense of Grubhub and other third-party platforms.  *See* Ex. 10.

---

[6] *See* Ex. 12 (Aug. 19, 2021 Int. 1897-A); Ex. 13 (Final Int. 1897-A).

Specifically, the Ordinances, by forcing third-party platforms to disclose the customer data —
which the Report acknowledged is valuable for platforms to "enhance their own services" — will
help "drive future profits for restaurant owners."  Ex. 10 at 10-12.

54.     Special-interest groups supported Int. 2311-A for these same reasons.  For example,
at the June 8, 2021 Committee hearing in which Int. 2311-A was discussed, the New York State
Restaurant Association testified that it supported the bill because it would "level[] the playing field
for restaurant[s]."  Ex. 14 (June 8, 2021 Committee Hearing Transcript) at 95:9-10.  Likewise, the
New York City Hospitality Alliance testified that the bill would "allow restaurants to basically
even the playing field," Ex. 14 at 88:5-6, and the New York Restaurant Association also testified
that it supported the bill because the "dynamic" between restaurants and third-party platforms
"needs to change."  Ex. 14 at 94:8-9.

55.     Comments from Council Members supporting the bill further demonstrate this
improper economic protectionism.  For instance, Council Member Keith Powers, Int. 2311-A's
chief sponsor, who is "the son of a former restaurant owner," Ex. 15 (July 29, 2021 Committee
Hearing Transcript) at 11:10-11, stated that "ultimately the intention of my bill" is to strike a
"balance and equity" between restaurants and third-party platforms, Ex. 14 at 20:7-10, and that the
bill intends to give "restaurants and [] local business" a "better opportunity to compete" with third-
party platforms long-term.  Ex. 14 at 20:21-21:2.  Speaker Corey Johnson likewise admitted that
the true purpose of the bill was to "create an equitable playing field" between restaurants and third-
party platforms.  Ex. 1 at 19:5-7.

56.     Int. 2311-A's true purpose is ***not*** to combat COVID-19's negative impact on
restaurants, as some have suggested.  As Council Member Yeger correctly explained, Int. 2311-A
"***is not a COVID-19-related bill***" because it "***has nothing to do with COVID-19***."  Ex. 15 at 14:25-

15:3 (emphasis added).  Notwithstanding the City's attempt to "pretend it does because that's the doorway by which" the bill was introduced, "it has nothing to do with it."  Ex. 15 at 15:3-5.  He further emphasized his "concerns" that the City was "once again" "***weaponizing . . . the pandemic for purposes of attacking an industry that we don't like***" and "***hiding under COVID as a reason for data to transmit from one party to another***."  Ex. 1 at 45:12-19 (emphasis added).

### ii.   Negative Consequences to Consumer Privacy

57.   Privacy-advocacy groups, third-party platforms, and Council Members strongly opposed Int. 2311-A because of its severe and adverse impact on consumer privacy.

58.   Privacy-advocacy groups Tech:NYC and EFF "strongly oppose[d]" Int. 2311-A because it places the private, sensitive information of consumers in imminent jeopardy — the "***bill simply assumes that restaurants have the technical capacity to download [the customer data] and store it in a way that will not allow for unauthorized individuals to access it*** . . . not all restaurants will have the resources to invest in a secure operating system to download and keep this information secure."  Ex. 9 at 44 (emphasis added).  For those reasons the disclosed customer data will be susceptible to a "security breach," and the ***"[f]orced dissemination of personal information will no doubt lead to unsolicited calls and text messages, email spam, and junk mail***."  Ex. 9 at 45 (emphasis added).  Tech:NYC and EFF also noted that third-party platforms and restaurants were already "working together every day to find new ways to promote growth in local stores and expand the customer base in those local stores without the dangerous data sharing mandate contemplated by this bill."  Ex. 9 at 44.  Furthermore, the type of information contained in the customer data "is not the type of personal information merchants would require during their normal course of business."  Ex. 9 at 44.  For instance, "a consumer who dines-in at a restaurant today does not have to provide the restaurant the very same information that Int. 2311-2021

mandates to be disclosed. On the other hand, this information is required by the platforms, solely to perform food purchasing transactions and delivery." Ex. 9 at 44.[7]

59.     Third-party platforms Grubhub, Uber Eats, and DoorDash also expressed their opposition toward the bill.

60.     A Grubhub representative emphasized that third-party-platform customers "do not expect their information to be shared with" restaurants because the relevant data is "not traditionally collected by restaurants in the analog world." Ex. 9 at 21.  Imperatively, third-party platforms would be required to disclose the data even where the restaurant "does not have adequate security processes in place to protect that data," consequently "undercut[ting] the privacy rights of New York City consumers." Ex. 9 at 21.  The compelled disclosures would also "no doubt lead to unsolicited calls and text messages, email spam, and junk mail." Ex. 9 at 21.

61.     An Uber Eats representative similarly stated that third-party platforms have adequate "data security and privacy program[s]" because they are "subject to strict [international, national, and state] laws." Ex. 9 at 24.  Restaurants "that receive this data," meanwhile, "would not be subject to any such data protection requirements." Ex. 9 at 24.

62.     A DoorDash representative called the bill "an assault on consumer privacy that other jurisdictions have previously considered and rejected." Ex. 9 at 19 (emphasis added).  The representative also emphasized the bill's lack of "any effective safeguards in place to ensure that restaurants are protecting this sensitive data," and that "many restaurants are not able to invest in the sources necessary to keep data secure from modern threats." Ex. 9 at 20.

---

[7] In fact, dine-in restaurants would be prohibited from requiring such information under N.Y. Gen. Bus. Law § 520-A(3).

63.     Finally, Council Member Yeger explained that, because Int. 2311-A gives restaurants the ability to keep the customer data "in perpetuity," the bill "remov[es] the choice from consumers." Ex. 15 at 15:15-16:9.  Accordingly, Council Member Yeger stated he could not vote for this "anti-consumer bill." Ex. 15 at 16:8-9.

## E.     The City's Pretextual Reliance on COVID-19 Does Not Change the Fact that the Ordinances are an "Attack" on Third-Party Platforms

64.     The Ordinances are only the City's latest effort to use the COVID-19 pandemic as a pretext for economically disadvantaging third-party platforms to the benefit of restaurants.

65.     In May 2020, Mayor de Blasio signed NYC Int. 1908-B into law, codified at N.Y.C. Admin. Code §§ 20-845–20-848 (the "Fee Cap").  The Fee Cap made it unlawful "for a third-party food delivery service to charge a food service establishment a delivery fee that totals more than 15% of the purchase price of each online order," and "for a third-party food delivery service to charge a food service establishment any fee other than a delivery fee for the use of their service greater than 5% of the purchase price of each online order," except for pass-through credit-card fees.  N.Y.C. Admin. Code § 20-846(a), (b).  Originally, the Fee Cap was set to expire 90 days after the ban on on-premises dining was lifted.

66.     As with the Ordinances, however, City Council members demonstrated that COVID-19 was merely a pretext for imposing price-fixing regulations they wanted regardless of COVID-19.  Council Member Francisco Moya, for example, stated that "NYC local restaurants needed a 10% cap on delivery fees from third party services like GrubHub long before #COVID19 hit us.  They damn sure need it now."  Francisco Moya, Twitter.com (Apr. 14, 2020), https://bit.ly/3CBqsaA.  He also said that the "relationship" between "[m]om and pop restaurants across New York City" and "billion-dollar tech companies . . . isn't unique to the pandemic."  *New*

*York City Council, Council Votes to Provide Relief to Small Businesses and Restaurants Impacted by COVID-19 Pandemic* (May 13, 2020), https://on.nyc.gov/37sNySA.

67.     In August 2020, the City Council extended the Fee Cap for the first time — through 90 days after full-capacity indoor dining in restaurants resumed.  *See* NYC Int. No. 2054-A, attached as Ex. 16.  When then-Governor Cuomo ended capacity restrictions for restaurants on May 19, 2021, which meant that restaurants could resume indoor dining at 100% capacity, a 90-day clock began for the Fee Cap, which should have expired on August 17, 2021.

68.     However, on July 29, 2021, as New York City COVID-19 numbers were nearing an annual low, *see Tracking Coronavirus in New York: Latest Map and Case Count*, The New York Times (last visited Dec. 10, 2021), https://www.nytimes.com/interactive/2021/us/new-york-covid-cases.html, the City Council approved another Fee Cap extension, this time picking the arbitrary end date of February 17, 2022.  *See* NYC Int. No. 2359-A, attached as Ex. 17.  This Fee Cap iteration does not even reference a state of emergency or corresponding state-mandated capacity restrictions due to COVID-19.

69.     On September 26, 2021, the City Council enacted Int. 2390, codified at N.Y.C. Admin. Code § 20-563.3, which made the Fee Cap permanent, regardless of COVID-19 capacity restrictions.

70.     That same day, the City Council enacted Int. 1897-A, which, in addition to containing the unconstitutional data-disclosure requirement detailed in this Complaint, hamstrings third-party platforms through various additional requirements, notably a prohibition (applying both proactively and retroactively) on third-party platforms including indemnification provisions in contracts with food service establishments.  *See* N.Y.C. Admin. Code § 20-563.6.  Int. 1897-A also ties these restrictions to the ability of third-party platforms to be licensed for operation in New

York City and provides a private cause of action to "[a]ny person alleging a violation of" the Subchapter.  *See* N.Y.C. Admin. Code §§ 20-563.9, 20-563.12.

71.    These laws are intended to favor restaurants and disadvantage third-party platforms, despite the stated goal of combatting the economic fallout from the pandemic.  In other words, as stated by Council Member Yeger, these laws are aimed at "attacking an industry that [the City Council] do[es]n't like."  Ex. 1 at 45:15.

**F.    The Ordinances Target and Irreparably Harm Grubhub And Will Harm Restaurants, Customers, and Delivery Couriers**

72.    Restaurants using Grubhub leverage its marketing, advertising, and security capabilities and, in turn, strengthen their menus, pricing, and delivery footprints.  Grubhub provides these advantages to restaurants in exchange for fixed-percentage fees (the ceiling for which is now mandated by the Fee Cap).

73.    Grubhub will be irreparably harmed by the Ordinances — not only as a result of the unconstitutional compelled disclosure itself, but also because of the damage to its reputation, goodwill, and business model.  For example:

    a.  Grubhub will likely need to terminate certain or all of its existing restaurant contracts and may (to avoid divulging proprietary customer data) decline to enter into new restaurant contracts.

    b.  If restaurants receive Grubhub's valuable trade secrets at no cost, it will be harder for Grubhub to compete.  Restaurants will have less incentive to continue their partnerships with Grubhub.  Moreover, because of the Fee Cap, Grubhub will be unable to recover these lost revenues through fee increases and will likely be forced to recover those revenues through increased consumer fees. These negative impacts on Grubhub's business will harm consumers.

25

c. Grubhub will also need to offset losses due to the cost and burden of complying with the Ordinances.  Specifically, it will likely take six months to a year to provide an opt-out disclaimer for every order and to create the technology to ensure that the data disclosed to each restaurant is accurate.

d. If restaurants are able to use Grubhub's customer data to solicit and market directly to consumers, Grubhub risks losing customers.

e. The Ordinances will likely force Grubhub to scale back its marketing and promotional services in New York City because of revenues that will be lost to restaurants.

f. Grubhub, along with restaurants, will inevitably face consumer lawsuits stemming from data-privacy breaches occurring as a result of restaurants' inadequate security systems.

## FIRST CAUSE OF ACTION

**(Declaratory Relief, Preliminary and Permanent Injunctive Relief, and Damages for Violation of the First Amendment of the United States Constitution (42 U.S.C. § 1983); Declaratory Relief and Preliminary and Permanent Injunctive Relief for Violation of Article I, Section 8, of the New York Constitution (Compelled Speech))**

74. Grubhub realleges and incorporates herein by reference Paragraphs 1 through 73 above.

75. The Ordinances violate the First Amendment of the United States Constitution by compelling Grubhub to share sensitive personal and commercial information with third parties, even though it is against Grubhub's interests to do so.  Absent the Ordinances, Grubhub would not disclose this information to third-party restaurants.  By compelling Grubhub to speak a particular message, the Ordinances alter the ***content*** of Grubhub's speech and require it to say things that are against its own business interests.

76.     The Ordinances are, therefore, content-based laws subject to strict scrutiny; they are presumptively unconstitutional and may be justified only if the government proves they are narrowly tailored to serve compelling state interests.

77.     The City cannot demonstrate that the Ordinances serve compelling state interests. The stated justification of the law — to "level[] the playing field"[8] in accordance with the political agenda of certain members of the City Council (while dangerously intruding upon private, sensitive trade secret information of individuals in New York City) — is not a legitimate, let alone compelling, state interest.  Nor is there any other compelling state interest in supporting the Ordinances.

78.     But even if there were compelling state interests for the Ordinances (which there are not), the Ordinances are not narrowly tailored to achieve any such interests.  For example, the Ordinances do not require advertising companies, online reservation platforms, or point-of-sale service providers to disclose customer data to restaurants.  Moreover, the same result can be achieved through means that would not violate the constitutional rights of Grubhub and other third-party platforms.  Indeed, restaurants can simply sign up for Grubhub Direct to receive direct access to customer data.

79.     Even if strict scrutiny did not apply — and it does — the Ordinances also fail to pass constitutional muster under intermediate scrutiny as well.

80.     For substantially similar reasons, the Ordinance violates Article I, Section 8, of the New York Constitution.

---

[8] Statement of Council Member and chief sponsor Keith Powers to Gay City News. *See* Matt Tracy, *Council Passes Restaurant Data Sharing Bill Opposed by GMHC, NGLCC*, Gay City News (July 29, 2021), https://www.gaycitynews.com/council-passes-controversial-restaurant-data-sharing-bill-opposed-by-gmhc-nglcc/.

81.     Under 42 U.S.C. § 1983, this violation of the United States Constitution may be imputed to the City as a municipality.

82.     The City acted under color of state law, pursuant to an official policy or custom, in enacting the Ordinances, which proximately caused Grubhub's injury.

83.     There is a *bona fide* and actual controversy between Grubhub and the City because the City enacted the Ordinances, even though they violate the First Amendment of the United States Constitution and Article I, Section 8, of the New York Constitution.  Grubhub maintains that the Ordinances are illegal and unconstitutional.  The City claims otherwise.

84.     Grubhub requests a judicial determination regarding the validity of the Ordinances to prevent the harm caused by their enactment.  Such a determination is both necessary and appropriate to avoid the deprivation of Grubhub's constitutional rights, which would occur if the Ordinances are applied to Grubhub.

85.     In light of the violation of the First Amendment of the United States Constitution, as well as Article I, Section 8, of the New York Constitution, Grubhub seeks preliminary and permanent injunctive relief against enforcement of the Ordinances.  Grubhub would be irreparably harmed if it were forced to disclose the sensitive proprietary information required by the Ordinances.

86.     Grubhub also seeks monetary damages as a result of the First Amendment violations caused by the Ordinances.

## SECOND CAUSE OF ACTION

**(Declaratory Relief, Preliminary and Permanent Injunctive Relief, and Damages for Violation of the Contract Clause of the United States Constitution (42 U.S.C. § 1983))**

87.     Grubhub realleges and incorporates herein by reference Paragraphs 1 through 86 above.

88.     The Ordinances violate Article 1, Section 10, of the United States Constitution, which forbids state and local governments from passing any "Law impairing the Obligation of Contracts."  The Contract Clause restricts the power of States to disrupt existing contractual arrangements.  That governmental power is limited because contracts enable individuals to order their personal and business affairs according to their particular needs and interests.  Once arranged, those rights and obligations are binding under the law, and the parties are entitled to rely on them.

89.     The Ordinances substantially impair Grubhub's long-standing contracts with New York City restaurants.  The terms of those agreements were mutually entered into without either party contemplating that Grubhub would be forced to disclose valuable proprietary trade secrets and/or confidential information.  Nor did the parties contemplate that restaurants would be able to use that property to directly solicit customers away from Grubhub.

90.     This impairment is especially egregious in light of the Fee Cap's ceiling on fees Grubhub can charge restaurants.  That ceiling limits Grubhub's ability to recover from restaurants the money it will lose from having to disclose its customer data as required by the Ordinances.

91.     The Ordinances also substantially impair Grubhub's contractual agreements with customers.  Customers rely on Grubhub's Terms of Use and Privacy Policy, which prohibit the transfer and collection of their personal information as would be required by the Ordinances.

92.     The Ordinances also do not serve a legitimate public purpose because they provide a benefit to special interests — i.e., restaurants — and are not aimed at remedying an important general social or economic problem.  Picking and supporting one side in a particular market is nothing more than improper economic protectionism.  Even if such favoring were a legitimate public purpose (and it is not), the Ordinances' means of accomplishing that interest — seriously

endangering the privacy of countless individuals in New York City — are neither reasonable nor necessary.

93.     Under 42 U.S.C. § 1983, this violation of the United States Constitution may be imputed to the City as a municipality.

94.     The City acted under color of state law, pursuant to an official policy or custom, in enacting the Ordinances, which proximately caused Grubhub's injury.

95.     There is a *bona fide* and actual controversy between Grubhub and the City because the City enacted the Ordinances, even though they violate the Contract Clause of the United States Constitution.  Grubhub maintains that the Ordinances are illegal and unconstitutional.  The City claims otherwise.

96.     Grubhub requests a judicial determination regarding the validity of the Ordinances to prevent the harm caused by their enactment — specifically, to avoid being deprived of the benefit of its longstanding contracts with restaurants.  Such a determination is both necessary and appropriate to avoid the deprivation of Grubhub's constitutional rights, which would occur if the Ordinances are applied to Grubhub.

97.     In light of the violation of the Contract Clause of the United States Constitution, Grubhub seeks preliminary and permanent injunctive relief against enforcement of the Ordinances.  Grubhub would be irreparably harmed if it were forced to disclose the sensitive proprietary information required by the Ordinances.

98.     Grubhub also seeks monetary damages as a result of the Contract Clause violations caused by the Ordinances.

### THIRD CAUSE OF ACTION

**(Declaratory Relief, Preliminary and Permanent Injunctive Relief, and Damages for Violation of the Takings Clause of the Fifth Amendment to the United States Constitution**

**(42 U.S.C. § 1983); Declaratory and Preliminary and Permanent Injunctive Relief for Violation of Article I, Section 7, of the New York Constitution (Takings))**

99.     Grubhub realleges and incorporates herein by reference Paragraphs 1 through 98 above.

100.    The United States and New York Constitutions prohibit the government from taking private property without just compensation.  Grubhub has a property interest in its customer data, which is both highly confidential and a trade secret.

101.    The Ordinances effectuate a *per se* or categorical taking of Grubhub's property because Grubhub owns an exclusive right to that property.  If Grubhub is forced to share its trade-secret customer data with restaurants, the value of that property right will be diminished to nothing. The Ordinances are a physical invasion of Grubhub's property, rather than a public program adjusting the benefits and burdens of economic life to promote the common good.  Specifically, the Ordinances benefit a specific set of the public — restaurants — rather than the common good.

102.    As regards Grubhub's investment-backed expectations, Grubhub could not have reasonably foreseen that New York City would require it to disclose against its will its extremely valuable and sensitive trade-secret property.

103.    The City may be held liable for this violation of the United States Constitution under 42 U.S.C. § 1983.

104.    The City acted under color of state law, pursuant to an official policy or custom, when it enacted the Ordinances.

105.    Grubhub's injury is proximately caused by the City's unconstitutional conduct.

106.    There is a *bona fide* and actual controversy between Grubhub and the City because the City enacted the Ordinances, even though they violate the Takings Clause of the Fifth and Fourteenth Amendments to the United States Constitution and Article 1, Section 7, of the New

York Constitution.  Grubhub maintains that the Ordinances are illegal and unconstitutional.  The City claims otherwise.

107.    Grubhub requests a judicial determination regarding the validity of the Ordinances to prevent the harm caused by their enactment.  Such a determination is both necessary and appropriate to avoid the deprivation of Grubhub's constitutional rights, which would occur if the Ordinances are applied to Grubhub.

108.    In light of the violation of the Takings Clause of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 7, of the New York Constitution, Grubhub seeks preliminary and permanent injunctive relief against enforcement of the Ordinances.  Grubhub would be irreparably harmed if it is forced to disclose the sensitive proprietary information required by the Ordinances.

109.    Grubhub also seeks monetary damages as a result of the Takings Clause violations caused by the Ordinances.

## FOURTH CAUSE OF ACTION

**(Declaratory and Preliminary and Permanent Injunctive Relief for Violation of Article IX, Section 2(c), of the New York Constitution, New York Municipal Home Rule Law Section 10(ii)(a)(12), and New York General City Law Section 20(13) (Police Power))**

110.    Grubhub realleges and incorporates herein by reference Paragraphs 1 through 109 above.

111.    The City may exercise police power to enact laws only if they relate to the safety, health, well-being, and welfare of individuals in New York City *generally*, rather than with respect to a particular group, such as restaurants.  Where, as here, the law bears no relation to the welfare of the public but is designed for the convenience and interest of a special class, that grant of police power is exceeded.

112.    Upon information and belief, the City has not undertaken, either by itself or through another party, analysis concerning the supposedly positive impact on the public if restaurants gain access to private, sensitive customer information.  Conversely, research demonstrates that (i) one year after joining Grubhub, restaurants grow monthly takeout revenue by an average of 30%, six times greater than restaurants not using Grubhub; (ii) one in five restaurants double their takeout revenue one year after working with Grubhub; (iii) small restaurants typically see their revenue increase 50% after partnering with Grubhub; and (iv) Grubhub cuts order processing times by over 50%, helping restaurateurs spend more time making food and less time managing orders.

113.    The City exceeded the bounds of its police power in enacting the Ordinances for the additional reason, as detailed below, that the Ordinances conflict with, and are preempted by, N.Y. Civ. Rights Law §§ 50-51.

114.    There is a *bona fide* and actual controversy between Grubhub and the City because the City enacted the Ordinances, even though they violate Article IX, Section 2(c), of the New York Constitution.  Grubhub maintains that the Ordinances are illegal and unconstitutional.  The City claims otherwise.

115.    Grubhub requests a judicial determination regarding the validity of the Ordinances to prevent the harm caused by their enactment.  Such a determination is both necessary and appropriate because the Ordinances would result in substantial hardship to Grubhub.  A judicial determination with respect to the Ordinances' validity is necessary and appropriate to avoid the deprivation of state constitutional and statutory rights that would result from the Ordinances.

116.    In light of the violation of Article IX, Section 2(c), of the New York Constitution, Grubhub further seeks preliminary and permanent injunctive relief against enforcement of the

Ordinances.  Grubhub would be irreparably harmed if it were forced to disclose the sensitive proprietary information required by the Ordinances.

## FIFTH CAUSE OF ACTION

### (Declaratory Relief for Preemption by N.Y. Civ. Rights Law §§ 50-51)

117.    Grubhub realleges and incorporates herein by reference Paragraphs 1 through 116 above.

118.    N.Y. Civ. Rights Law §§ 50-51 prohibit the use of a person's name for "advertising purposes, or for the purposes of trade . . . *without having first obtained the written consent of such person*."  § 50 (emphasis added).

119.    By contrast, §§ 20-847.3(b), (c) and 20-563.7(b), (c) of the Ordinances permit food service establishments to "use [customer] data" — which includes the customer's name — "for marketing or other purposes" *without the customer's express written consent*.

120.    The City's argument that customers are "presumed to have consented" unless they specifically opt out is insufficient to satisfy the consent requirements of N.Y. Civ. Rights Law §§ 50-51.  There will be countless instances where a customer places an order and does not realize that he or she had a choice to opt out.  This is especially true because the Ordinances require explicit customer opt out for every "specific online order."  §§ 20-847.3(b) and 20-563.7(b).

121.    The Ordinances permit restaurants to use customer names (without the customer's consent) for "marketing or other purposes," which is exactly the sort of activity contemplated by N.Y. Civ. Rights Law §§ 50-51's prohibition against using a person's name for "advertising purposes" or "for the purposes of trade" without that person's prior consent.

122.     If the Ordinances go into effect, restaurants will use customer names, along with customer e-mail and physical addresses, to solicit customers and advertise the restaurant's products and services.

123.     N.Y. Civ. Rights Law §§ 50-51 preempt N.Y.C. Admin. Code §§ 20-847.3(b), (c) and 20-563.7(b), (c) of the Ordinances due to the direct conflict between them.

124.     There is a *bona fide* and actual controversy between Grubhub and the City because the City enacted the Ordinances, even though they are preempted by N.Y. Civ. Rights Law §§ 50-51.  Grubhub maintains that the Ordinances are invalid and void as a matter of law.  The City claims otherwise.

125.     Grubhub seeks a declaratory judgment that the relevant portions in N.Y.C. Admin. Code §§ 20-847.3(b), (c) and 20-563.7(b), (c) of the Ordinances are invalid.

### SIXTH CAUSE OF ACTION

**(Declaratory Relief, Preliminary and Permanent Injunctive Relief, and Damages for Violation of the Dormant Commerce Clause of the United States Constitution (42 U.S.C. § 1983))**

126.     Grubhub realleges and incorporates herein by reference Paragraphs 1 through 125 above.

127.     The Ordinances facially discriminate against interstate commerce.

128.     The Ordinances have the purpose and effect of imposing a substantial burden on, and discriminating against, interstate commerce.

129.     Despite Grubhub's headquarters and state of incorporation both being outside of New York, it falls under Int. 2311-A's definition of "third-party food delivery service," which is "any website, mobile application or other internet service that offers or arranges for the sale of food and beverages prepared by, and the same-day delivery or same-day pickup of food and

beverages from, no fewer than 20 food service establishments located in the city that are owned and operated by different persons." N.Y.C. Admin. Code § 20-845.

130.    By not applying to local third-party platforms serving less than 20 food service establishments, Int. 2311-A discriminates against larger, out-of-state third-party platforms such as Grubhub. Int. 1897-A, too, even without the same numerical threshold, discriminates against out-of-state third-party platforms such as Grubhub in favor of New York City restaurants.

131.    Where, as here, a local law discriminates against interstate commerce either on its face or in practical effect, the burden falls on the City to demonstrate both that the statute serves a legitimate local purpose, and that this purpose could not be served as well by available nondiscriminatory means.

132.    The City cannot meet this burden because "attacking an industry that [the City Council] do[es]n't like" under the guise of COVID-19 relief is not a legitimate local purpose. Ex. 1 at 45:15. And even if it were, that purpose could be advanced by various nondiscriminatory means, including tax breaks and loan programs or using Grubhub Direct.

133.    Even if the Ordinances were found to discriminate against interstate commerce only in practical effect, rather than on their face, they would nonetheless violate the Dormant Commerce Clause because the burdens they impose on interstate trade are excessive in relation to the putative local benefits.

134.    Under 42 U.S.C. § 1983, this violation of the United States Constitution may be imputed to the City as a municipality.

135.    The City acted under color of state law, pursuant to an official policy or custom, in enacting the Ordinances, which proximately caused Grubhub's injury.

136.     There is a *bona fide* and actual controversy between Grubhub and the City because the City enacted the Ordinances, even though they violate the Dormant Commerce Clause of the United States Constitution.     Grubhub maintains that the Ordinances are illegal and unconstitutional.  The City claims otherwise.

137.     Grubhub requests a judicial determination regarding the validity of the Ordinances to prevent the harm caused by their enactment.  Such a determination is both necessary and appropriate to avoid the deprivation of Grubhub's constitutional rights, which would occur if the Ordinances applied to Grubhub.

138.     In light of the violation of the Dormant Commerce Clause of the United States Constitution, Grubhub seeks preliminary and permanent injunctive relief against enforcement of the Ordinances.  Grubhub would be irreparably harmed if it is forced to disclose the sensitive proprietary information required by the Ordinances.

139.     Grubhub also seeks monetary damages as a result of the Dormant Commerce Clause violations caused by the Ordinances.

### SEVENTH CAUSE OF ACTION

**(Declaratory Relief, Preliminary and Permanent Injunctive Relief, and Damages for Violation of the Due Process Clause of the United States Constitution (42 U.S.C. § 1983); Declaratory and Preliminary and Permanent Injunctive Relief for Violation of Article I, Section 6, of the New York Constitution (Due Process))**

140.     Grubhub realleges and incorporates herein by reference Paragraphs 1 through 139 above.

141.     The Ordinances violate the Due Process Clause of Section 1 of the Fourteenth Amendment to the United States Constitution and the Due Process Clause of Article I, Section 6, of the New York Constitution because they irrationally and arbitrarily compel disclosure of data

from third-party platforms, while providing preferential economic treatment to local restaurants at the direct expense of those platforms.

142.    Grubhub's interest in operating its business free from unreasonable governmental interference, as well as excessive and unreasonable government conduct directed intentionally toward it, is constitutionally protected.   The Ordinances interfere with that constitutionally protected interest, and do so with no reasonable or nondiscriminatory legislative purpose.   The Ordinances have no relation to the health, safety, or general welfare of the public.   Supporting one industry at the expense of another is not a legitimate legislative purpose.

143.    No rational basis exists that would justify compelling disclosure of trade secrets or similarly sensitive commercial data without adequate compensation.

144.    The context and content of the Ordinances establish that they are confiscatory in nature and are intended to harm third-party platforms because they, for all intents and purposes, force the platforms to subsidize certain restaurants' profit margins by compelling disclosure of valuable trade secrets and/or highly confidential information.   The City is, at bottom, "attacking an industry [it does not] like."   Ex. 1 at 45:15.

145.    The Ordinances' unreasonable interference with Grubhub's business, when viewed along with the harmful effects to the restaurant industry and its customers which will inevitably ensue from the Ordinances, demonstrates that the Ordinances are arbitrary and irrational, have no rational basis, and were enacted in violation of due process.

146.    The Ordinances are arbitrary and irrational for the additional reason they do not require advertising companies, online reservation platforms, or point-of-sale service providers to disclose customer data to restaurants.

147.    The City may be held liable for this violation of the United States Constitution under 42 U.S.C. § 1983.

148.    The City acted under color of state law, pursuant to an official policy or custom, when it enacted the Ordinances.

149.    Grubhub's injury is proximately caused by the City's unconstitutional conduct.

150.    There is a *bona fide* and actual controversy between Grubhub and the City because the City enacted the Ordinances, even though they violate Article I, Section 6, of the New York Constitution and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.  Grubhub maintains that the Ordinances are illegal and unconstitutional.  The City claims otherwise.

151.    Grubhub requests a judicial determination regarding the validity of the Ordinances to prevent the harm caused by their enactment.  Such a determination is both necessary and appropriate to avoid the deprivation of Grubhub's constitutional rights, which would occur if the Ordinances are applied to Grubhub.  The enactment of the Ordinances results in substantial hardship to Grubhub.

152.    In light of the violation of the Article I, Section 6, of the New York Constitution and the Fourteenth Amendment to the United States Constitution, Grubhub further seeks preliminary and permanent injunctive relief against enforcement of the Ordinances.  The ongoing violation of Grubhub's constitutional rights constitutes irreparable harm, as does the Ordinance's long-term deleterious effect on Grubhub's reputation, goodwill, and business model.

153.    Grubhub also seeks monetary damages as a result of the Due Process Clause violations caused by the Ordinances.

## EIGHTH CAUSE OF ACTION

**(Declaratory Relief, Preliminary and Permanent Injunctive Relief, and Damages for Violation of the Equal Protection Clause of the United States Constitution (42 U.S.C. § 1983); Declaratory and Preliminary and Permanent Injunctive Relief for Violation of Article I, Section 11, of the New York Constitution (Equal Protection))**

154.    Grubhub realleges and incorporates herein by reference Paragraphs 1 through 153 above.

155.    The Ordinances violate the Fourteenth Amendment's Equal Protection Clause, which requires rational relation between a legitimate government interest and the reason for treating two groups differently.

156.    Forcing Grubhub and other third-party platforms to disclose commercially valuable trade secrets to restaurants imposes an irrational and arbitrary burden on Grubhub to support an unreasonable and discriminatory legislative purpose.  Other third-parties, such as advertising companies, online reservation platforms, and point-of-sale service providers, are not similarly compelled to disclose their sensitive, proprietary information.  As detailed above, the City's animus toward third-party platforms was a substantial factor in enacting the Ordinances.

157.    Int. 2311-A is also irrational and arbitrary for its baseless distinction between third-party platforms serving 20 or more food service establishments and third-party platforms serving less than 20 food service establishments.  This distinction is not justified by research and operates solely to harm larger third-party platforms in favor of similar businesses that are smaller and based locally.  This is evidenced by the fact that Int. 1897-A dropped the 20-or-more requirement from its definition of "third-party food delivery service."  *See* N.Y.C. Admin. Code § 20-563 ("The term 'third-party food delivery service' means any website, mobile application or other internet service that: (i) offers or arranges for the sale of food and beverages prepared by, and the same-day delivery or same-day pickup of food and beverages from, a food service establishment; and (ii)

that is owned and operated by a person other than the person who owns such food service establishment.").

158.    The City may be held liable for this violation of the United States Constitution under 42 U.S.C. § 1983.

159.    The City acted under color of state law, pursuant to an official policy or custom, when it enacted the Ordinances.

160.    Grubhub's injury is proximately caused by the City's unconstitutional conduct.

161.    There is a *bona fide* and actual controversy between Grubhub and the City because the City enacted the Ordinances, even though they violate the Equal Protection Clauses of the United States and New York Constitutions.  Grubhub maintains that the Ordinances are illegal and unconstitutional.  The City claims otherwise.

162.    Grubhub requests a judicial determination regarding the validity of the Ordinances to prevent the harm caused by their enactment.  Such a determination is both necessary and appropriate to avoid the deprivation of Grubhub's constitutional rights, which would occur if the Ordinances are applied to Grubhub.  The enactment of the Ordinances results in substantial hardship to Grubhub.

163.    In light of the violation of the Equal Protection Clauses of the United States and New York Constitutions, Grubhub further seeks preliminary and permanent injunctive relief against enforcement of the Ordinances.  The ongoing violation of Grubhub's constitutional rights constitutes irreparable harm, as does the Ordinance's long-term deleterious effect on Grubhub's reputation, goodwill, and business model.

164.    Grubhub also seeks monetary damages as a result of the Equal Protection Clause violations caused by the Ordinances.

## PRAYER FOR RELIEF

WHEREFORE, Grubhub respectfully requests that this Court enter judgment in Grubhub's favor and grant the following relief:

1.      A declaration that the Ordinances violate the provisions of the United States Constitution and the New York Constitution identified above;

2.      A declaration that the relevant portions in N.Y.C. Admin. Code §§ 20-847.3(b), (c) and 20-563.7(b), (c) of the Ordinances are preempted by N.Y. Civ. Rights Law §§ 50-51 and are therefore null and void and have no legal effect;

3.      Just compensation, according to proof, for taking of property;

4.      An award of damages against the City, according to proof;

5.      A preliminary and permanent injunction enjoining the City from enforcing the Ordinances against Grubhub;

6.      An award of fees, costs, expenses, and disbursements, including attorneys' fees and expert fees to which Grubhub is entitled pursuant to 42 U.S.C. § 1988 and other applicable law; and

7.      Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Grubhub demands a trial by jury in this action of all issues so triable.

Dated:        New York, New York
              December 10, 2021

                                        CAHILL GORDON & REINDEL LLP

                                        By: /s/ Joel Kurtzberg
                                            Joel Kurtzberg
                                            Adam S. Mintz
                                            John S. MacGregor
                                            Jason Rozbruch
                                            32 Old Slip
                                            New York, NY 10005
                                            Telephone:  (212) 701-3120
                                            JKurtzberg@cahill.com

                                        *Attorneys for Plaintiff Grubhub Inc.*